## THE SUSQUEHANNA.

## TERMINAL FUMIGATING CO. v. UNITED STATES.

(District Court, D. Massachusetts. May 22, 1923.)

1. Maritime liens ⟐⟐9, 25—Services rendered in fumigating baggage of passengers held to give right to lien; "necessaries."

Services rendered on employment by its agent in fumigating the baggage of a steamship, required by the United States medical officer of the port before she would be allowed to land her passengers, *held* to give a right to a lien against the vessel, both under the general admiralty law and as "necessaries" under Merchant Marine Act, § 30, subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Necessaries.]

2. Maritime liens ⟐⟐30—Failure to inquire as to ownership of vessel held to defeat right to lien.

One rendering service to a steamship being operated under a charter sale contract with the Shipping Board, which prohibited the charterer from subjecting her to liens, who made no inquiry as to her ownership, *held* not entitled to a lien under Merchant Marine Act, § 30, subsec. R (Comp. St. Ann. Supp. 1923, § 8146¼pp).

In Admiralty. Suit by the Terminal Fumigating Company against the United States, as owner of the steamship Susquehanna. Petition dismissed.

Powers & Hall, of Boston, Mass., for libelant.

Charles P. Curtis, Jr., Sp. Asst. U. S. Atty., of Boston, Mass.

MORTON, District Judge. This is a suit against the United States, as owner of the steamer Susquehanna, to enforce an alleged right in rem against the steamer for services in fumigating the baggage of her passengers. It is submitted on an agreed statement of facts.

The Susquehanna sailed from a foreign port, bound to New York, with passengers and their baggage. On account of congestion in the port of New York, she put into Boston, intending to discharge there her passengers and their baggage, and transfer them from that point to New York by rail. On her arrival at Boston, the port surgeon of the United States Public Health Service refused to allow the steamer to dock until all baggage on board had been fumigated, and ordered such fumigation to be done. This action was taken in order to prevent the entry of typhus germs into the United States.

Thereupon the agent of the United States Mail Steamship Company, which was operating the vessel under the usual charter sales agreement with the Shipping Board, arranged with the libelant to do the fumigating, stating that it had been ordered by the health officer. The baggage was thereupon brought to the libelant's plant, where it was fumigated, and it was afterwards returned to the steamer, or delivered at the dock where she had gone. By reason of this fumigation she was enabled to discharge her passengers and their baggage, which would not have been permitted without it. No question is made about the amount charged.

The contentions of the respondent are (1) that the service did not give rise to a maritime lien; and (2) that, if it did, as the libelant could have learned by the exercise of due diligence that the steamer was chartered upon such terms that the charterer had no right to subject her to a lien, the libelant cannot enforce the lien against the vessel.

[1] As to (1): What services to a vessel are of such character as to give rise to a maritime lien against her is a question on which there has been much difference of judicial opinion. I doubt whether it is possible to state a short and exact rule. In The Onore, Fed. Cas. No. 10,538, Judge Benedict held that the service of a cooper in putting the cargo of a ship into landing order, rendered partly upon the vessel and partly upon the wharf, gave rise to a lien, "because it is a service necessary to enable the ship to earn freight, which is the sole object for which the ship is constructed and navigated. The contract of a ship is to carry and deliver the cargo." In The Wivanhoe (D. C.) 26 F. 927, it was held that the services of a compress company in compressing cotton, so that the vessel could take the specified number of bales, gave rise to a maritime lien. In Constantine v. Schooner River Queen (D. C.) 2 F. 731, it was held that services in weighing, inspecting, and measuring cargo, preparatory to its delivery, which were to be done by the vessel, gave rise to a lien. In Roberts v. Bark Windermere (D. C.) 2 F. 722, charges for medical attendance to a sailor are instanced as services unquestionably giving rise to a lien. In The Ascutney, 278 F. 991, reversed upon another point, 289 F. 802, 1923 A. M. C. 412, charges for fumigating the vessel were held entitled to a lien.

The situation of the Susquehanna on her arrival in Boston was that until she had passed quarantine she was under the control of the health authorities; they refused to

permit any of the baggage to be landed until it had been fumigated; and it was, practically speaking, out of the question to land the passengers without any of their baggage. It was the steamer's duty to deliver the baggage, and the burden was upon her to perform such acts as were required in order to make the landing legal on her part. She was not in her home port, which was New York.

In view of the decisions above referred to and of the principles of law on which they rest, it seems to me that the services performed by the libelant were of such character as to give rise to a maritime lien against the steamer, both under the general admiralty law and, as "necessaries," under the Maritime Lien Act of 1910 (36 Stat. 604 [U. S. Comp. Stat. 1916, § 7783 et seq.]) and the Merchant Marine Act of 1920 (41 Stat. 988 [Comp. St. Ann. Supp. 1923, §§ 8146¼–8146¼t]).

[2] As to (2): There remains the question whether this lien is unenforceable because of the libelant's failure to exercise due diligence to ascertain that the Susquehanna was under charter by the terms of which the charterers were forbidden from imposing liens upon her. The agreed statement recites that "the libelant had no actual notice of any provision of said sales agreement." It does not disclose that the libelant made any investigation, or even inquiry, as to the ownership of the steamer, or the relation in which the United States Mail Steamship Company stood to her. There is no reason to suppose that an inquiry, if made, would not have disclosed the truth. In The Clio, 43 F. 181, 1923 A. M. C. 47, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, it is said: "The libelants did not know any facts tending to show that the corporation did not own the vessel, and so far as appears made no inquiry or effort to ascertain what the facts might be" (page 48, Holmes, J.). Referring to the language of section 3 of the act of 1910 (Comp. St. § 7785), the court said in that case: "We regard these words as too plain for argument. * * * They call upon him [the materialman] to inquire." The charter party in the present case is, on the point under discussion, identical with that under which the Clio was being operated, and I am unable to distinguish this case from that. See, too, The Ascutney, 289 F. 802, 1923 A. M. C. 412; The Awensdaw, 289 F. 803, 1923 A. M. C. 505; The Thordis, 290 F. 255, 1923 A. M. C. 581.

Petition dismissed.